Mr. Weber, good morning. Good morning, Your Honors. May it please the Court, Corey Weber of BG Law for Appellant Michael Burkhart, Chapter 11, Plain Administrator. You want to reserve some time? Yes, Your Honor. Four minutes. Four minutes. Okay. Go ahead, please. Good morning, Your Honors. So, we're here to talk about several issues in regard to two motions to dismiss, the original complaint and then the First Amendment complaint. The first issue I'd like to focus on is the turnover claim. Now, Judge Montali in bankruptcy court dismissed the turnover claim on the basis of his theory that turnover requires that turnover only regard undisputed property. So, if appellees raise the issue that this is regarding disputed property, we can't pursue a turnover claim. But what exact property did you seek to have turned over? So, the turnover concerned the totality of the funds, VLGI, in the 2006 through 2008. Who had those funds? Basically, who had them? The appellees. Nobody else? They hadn't made a distribution to the other partners? There were distributions to other members of the funds. What the distributions were, we're not entirely sure. But it does appear there were distributions. And the turnover claim asserted a right as to both the funds and their assets, as well as all distributions that had been made before, whatever they were. How would you turnover property you don't have anymore? Does turnover go to proceeds, or does it require the turnoveree to pursue people downstream? Potentially. So, it would require the appellees to file suit against their members or make a demand on their members to return the funds as to the proceeds that have been distributed to the extent that they have been, or to the extent that information was provided to the plan administrator, if the plan administrator were to succeed on the turnover claim. In one respect, I tend to agree with you that turnover is kind of a remedy, and it can wait until the underlying claim of ownership is decided. But on the other hand, I think it's overused. I mean, oftentimes it's said, well, I'm entitled to damages for a breach of contract, therefore, turn over to me the money you owe me, which I don't think is an appropriate use of that because the damages money is not identifiable property that's subject to turnover. And there's prior case law, as the Court's aware of, where it talks about turnover not being appropriate for a breach of contract claims masquerading as turnover claims. That's not what this was. There are detailed allegations, including attached emails by certain of the appellees talking with each other about how their greatest fear going into this bankruptcy case were that the funds and the assets of the funds would be considered property of the bankruptcy estate, that the trustee, if one was appointed, would essentially take all the funds and their assets, and that they'd get paid a nickel on the dollar at most. They're entitled to insert their own interests, aren't they? I didn't read those emails as being at all anything extraordinary. I mean, they're protecting their own interests. They were protecting their own interests, but they are also fiduciaries, so to the extent of the funds. So my client, the plan administrator, is a member, on behalf of Heller-Ehrman, of the funds. The appellees, or at least the individuals, were managers of the funds. So they're not only required they are entitled to protect their own interests, but as fiduciaries, they have to go beyond that. They have to protect the interests of the funds and all their members, not simply act for their own self-interests. And that was the issue here. Not only were there emails and detailed discussions about what indicia of the funds could cause creditors or other people to consider the funds to be assets of the bankruptcy estate, one of the appellees sent an email, and this is in the allegations and the complaint and an attached exhibit, saying, we should keep things as verbal as possible. Why keep things as verbal as possible? Why create evidence? You're lawyers, as well as fiduciaries, and you think like a lawyer. Why do I care about turnover today? Don't I care more about the nexus of the claim, the attempts to recover part of the SpaceX money? There's a turnover that's like the tail wagging the dog, it seems to me, right here. Your big issue is overcoming the motion to dismiss without leave as to the core facts supporting your claim and the plausibility-possibility argument. So, Your Honor, I think both are just as applicable. So, we cited in both of our briefs, I think it was in the footnote one, that Lacey v. Maricopa County preserves the issues in the original complaint for purposes of appeal. But to directly address Your Honor's point about the SpaceX proceeds and what Judge Montali ruled was the- Tell me if I'm wrong, but it seems to me you have to win that part in order to even get to the turnover, and that was the point of my question. I don't think that- I would disagree with that, Your Honor. So, for turnover, we're just looking at the plain language of the statute. Right. So, these are funds. The funds and the assets of the funds are amounts that the plan administrator could use, sell. They're not of inconsequential value. So, that's as to the turnover issues. And this Court, as well as the Ninth Circuit, have repeatedly stated, including recent panels by-with Judge Ferris and Judge Corbett, that we start with the plain language of the statute, that we presume that Congress acted intentionally. If Congress wanted a gatekeeping function in terms of someone raising their hand and saying, I dispute this, and that's not a turnover claim, Congress could have said that. That's not what Congress said. Let me jump you ahead to another question. The appellees say that the firm had no common stock. How much common stock do you think the firm had? So, it's unclear based on the documents, and this goes also to Judge- Don't you have to say, eventually, we think we had X shares? So, it should be equal to the preferred shares to the extent that the plan administrator is successful on- And that's the way the prior distributions were done? Is that the basis for that? So, prior to the First Amendment complaint, we included detailed allegations as to prior distributions being based on both common and preferred stock. Do you have anything besides the prior distributions to support the contention it ought to be equal? So, the issue, Your Honor, is with the agreement, the one that the 2002 subfund appendix, and this goes also to Judge Brand's question, that Judge Montali relied on in dismissing the First Amendment complaint. I understand the questions you have about that agreement, but it seems to me eventually you're going to have to come forward and say, this was the deal. And I think your idea of the deal is it ought to be proportional, and my question is, do you have anything besides, at this point, besides the prior distributions to show that the deal was, in fact, equal common and preferred? So, we, no, and this is just the complaint part. So, there's detailed allegations in the complaint as to during the 2004 process at Pele's taking steps to Stonewall. So, there was detailed financial information requested that wasn't provided. There were spreadsheets that were locked, redacted. So, the answer is, you don't, but you hope to get some. During discovery, Your Honor, correct. Yeah, so, just for pleading purposes, we pleaded what the plan administrator could discover in the course of 2004 discovery before determining that there was Stonewalling and dragging the process out. And so, there was enough to state a claim, a plausible claim, and that's what the plan administrator did. How different would the prior distributions have been in dollar terms if the firm had no common stock and only preferred? Have you done that calculation? Yes, Your Honor. It's in the millions, although... I'm talking about the prior distributions, not the SpaceX. So, I also believe, I think it's... Those are hundreds of thousands in total, right? Yeah, I think the SpaceX was the big one. The prior distributions, I think, were less. I don't recall the exact amounts. I don't want to give a specific dollar figure as to the SpaceX based on the protective order in this case. I'm thinking more of the prior distributions. I think one of their arguments is, well, that was a mistake. We did it wrong. And if that were a small dollar amount, that would be consistent with their theory. It was just a rounding error, so to speak. Well, it goes even beyond the prior distributions by VLGI. In terms of the 2006 through 2008 funds, there are significant distributions that have been made, but zero dollars have been made to the plan administrator, or Heller-Ehrman, and they're basing that on unsigned, incomplete agreements for those funds, which Judge Montali appears to have also relied on, in dismissing without prejudice claims regarding the 2006 through 2008 funds without leap to amend saying that it was a discovery dispute. But meanwhile, attached to the complaints, I think it's Exhibit 7, is a unanimous consent by the individual members of the individual appellees that say that Heller-Ehrman is a member and was the manager of the 2006 through 2008 funds. So all the distributions that have gone out to the 2006 through 2008 fund members, we don't know how much, but it looks like it's significant amounts. So we're talking about millions and millions of dollars here, and these claims haven't seen the light of day yet. We haven't been allowed to proceed with discovery. Just two successive motions to dismiss, and the Court appears to have been relying on, and this goes to the plausibility argument, on an appendix that has a dispute as to it being a real document that's admissible. It was repeatedly alleged that it was cobbled together after the fact, included exhibits to it that were taken from different places, signatures from a prior agreement. It can't pass FRE-201 muster. So with that, I'll reserve the remainder of my time. Thank you, Your Honors. Thank you.  Lucien. Good morning. Good morning. For the record, John Lucien of Blank Rome, on behalf of the appellees, it's an honor to appear before this esteemed panel today. The plaintiffs had not one but two bites at the apple, three if you count the interlocutory appeal. All were unsuccessful. Why? Because they lacked plausibility. This is about plausibility, not possibility. Why are they not plausible? Because, and I will quote the documents, the common interest of VLGI will equal zero. This case starts and ends with that document. What about the prior distributions? Would the distribution on those prior distributions have been the same if there had been zero common stock interest? I believe Your Honor is referring to the two distributions referenced in the amended complaint from 2006. Sounds about right. In the hundreds of thousands of dollars. Yes, mid five-figure number actually. What the complaint, again, the burden is on the plaintiff. What the complaint fails to allege, and Judge Montali correctly noted, is the reason for that and whether there was any basis or any documents at all to support it. There are a variety of theories. It could have simply been, and the problem is it's something from two decades ago almost that was the, as happens a lot, preferred shares converted to common so that it had become common. Was it a scrivener's error, the person doing it, because it was such a small dollar amount made a mistake and no one caught it? Nothing nefarious about that at all, but to rely on that, it would be like saying I have a 20-year lease and I pay $100,000 a month in rent. In 2007, I paid $92,000. We don't have a record. No one remembers why. Oh, but it should be $92,000 for the next 17 years because of that one payment. That's why Judge Montali was on proper footing. And I will quote from his opinion with respect to the First Amendment complaint. This is the core of what this is about. He cites to the complaint, again, it's a motion to dismiss, so everything was viewed in the light most favorable to the plaintiff. He says, in paragraph 56 of the complaint, the plaintiff quotes directly the critical language in the critical document that summarizes succinctly what this dispute is all about. Quote, if you look at the 2002 appendix to the Heller-Ehrman VLG Investments LLC agreement, there are common interests and preferred interests. VLG had a preferred interest. VLG did not have a common interest. Parens see the language in the appendix that says, quote, the common interest of VLG will equal zero. That is in section 4A of the 2002 appendix. Plaintiff's problem is that very appendix that says the common interest will equal zero. It's true in the signed versions that were eventually located and provided, and it's true in the earlier unsigned versions that the plaintiff makes much of. They're identical. No, the plaintiff doesn't dispute that. The plaintiff does not allege any other version of the documents, any other agreement that says to the contrary, here's contract 1 and contract 2. The court needs to interpret them. We have a dispute. None of that here. He ignores the integration clause in that agreement that says any modifications have to be in writing. What you're hearing from the plaintiff, they do a very good job, is, well, maybe this, or maybe that, or maybe some more discovery will show us something. Well, they had extensive discovery. This is bankruptcy litigation. They used their 2004 powers. They acknowledge it, again, in the complaint. Thousands of e-mails and pages of documents produced. Deposition of VLGI. That's why Judge Montali I think properly pointed out you have to look at plausibility. We live in the post-Iqbal and post-Twombly world. It's been the law for two decades. It has to be plausibility. It can't just be, well, give me a third bite or a fourth bite at the apple. Let me keep going, Judge. Another chance I'll finally find something and get it right. That's not how our judicial process works. And if you add to it the Ninth Circuit's opinion in Century Aluminum, which Judge Montali also aptly pointed out, that two possible explanations are just that. It's possibility. It doesn't rise to the level of plausibility. Now, I think a summary of the key facts and chronology here is helpful to the panel, and I'm impressed you're already very well versed, which is something that took me many months to figure out. VLG was formed, VLGI, to invest in their startup clients. It's the benefit of representing them. Every now and then you get a SpaceX for every 100 that's a dud. VLG merged into Heller in 2003, five years before Heller's bankruptcy. I'd like to move you ahead because the time is short. I'd like you to talk about the releases. Absolutely. That gives me a difficulty because we're not talking about this typical case where you give a release and you say, I'm releasing you. I may not know everything, but I'm still releasing you. But this release was interpreted to apply to things that didn't even happen yet. You know, these distributions, the SpaceX distribution didn't even come about until 12 years later. And I have real difficulty seeing how a release in 2011 could apply to conduct that didn't happen until 2023 or thereabouts. I may have the years wrong. I respectfully disagree, Your Honor. I don't believe that's what Judge Montali did here. What Judge Montali did is he said the releases are not prospective in that regard. The releases were broad and included everything up until that point of time. That's precisely why when he granted our first motion to dismiss, he did it with leave to amend with respect to the 2021 distributions. So he — I think if you go back and look at it, and I understand where you're coming from, he preserved that, and that's why we had an amended complaint. He said if you think you have something there because that's not part of the releases, we argued that it was and we didn't win that, that you have the opportunity to do it. And they did come forward with that complaint. The release wasn't part of the dismissal of the first amended complaint? Is that correct? It was for all of the claims covered at the time of the release. And it released all — there were eight directors and officers who had been — or partners that had been sued under that. The amended complaint was — and all were released as to claims up to that time. The amended complaint only, per the court's order, was only allowed as to the 2021 SpaceX distributions. Do we know when the 2006 to 2008 funds made their distributions? The — well, for motion to dismiss purposes, they were not in there. But let me talk about that, then, because that's important. That's not what the — that's not what the plaintiff alleged in its complaint. The plaintiff alleged in its complaint with respect to the 2006 and 2008 funds no injury at all. We think we may own something in it. We're back to, again, well, maybe some more discovery, maybe some more of this. Maybe we'll get somewhere. We — it's not how the law works. You don't get seven bites at the apple and keep going until maybe you find something that gets passed in motion to dismiss, to then force the other side to say it's going to cost a million dollars to litigate, pay me something. That's why we have motions to dismiss. We've already spent significant funds. As you may be aware from the docket, and it's in our appendix — I mean, the record, when the other defendants, the other four, were dismissed, the plaintiff chose not to appeal their dismissal on the releases. Only the three that I represent, and —  Was it error for Judge Montali not to have allowed leave to amend regarding the VLGI distributions? Because he dismissed that without leave to amend for the reasons that you stated. There's no allegations. There's, you know, nothing here in this complaint. Should he have granted leave to amend and allowed that to be included in the First Amendment complaint? No, Your Honor, for several reasons. First, there's a serious statute of limitations problem. When you're talking about things that were done in 2006 to 2008 for a lawsuit filed in 2023, I think we were, here, this statute is there for a reason. And I point that out because I hope it's not lost on this Court, Jural bankruptcy judges. This is a case from 2008, and a lawsuit filed 13, 14, 15 years later. That is extraordinary. This is not something filed within the 546 limitations period and, hey, Judge, we need some more time or extensions. You all deal with that on a regular basis. This is something way after the fact, and only because, as they say, no good deed goes unpunished. Ironically, had my clients been nefarious and never told the trustee he was entitled to several million dollars of SpaceX distributions, wouldn't be here. But they did it by the book, by the penny, and the complaint acknowledges that they did it. So to that point and the 2021 alleged breach of fiduciary duty, what Judge Montali said is, okay, I'll give you a chance. If you think you have something there because that's not time barred, I'll let you amend and bring it. And what they brought utterly failed to be plausible because to the breach of fiduciary duty, as to the individuals taking that apart from VLGI, there's no allegation that they did anything untoward, nefarious, or breach of fiduciary duty. To the contrary, the complaint acknowledges, again, that they made the distributions exactly as the documents say. Now, the trustee disputes that that's correct, thinks he should also get common shares. But to bring the argument full circle, the reason he doesn't is why this was created in the first instance, which is the partners of VLGI created this fund for their own benefit. And then they decided that they would set some of it aside through preferred shares to create an employee bonus pool. No obligation otherwise to do anything. And the trustee is trying to leapfrog from the employee pool, because he inherited the employee rights through the Heller bankruptcy, to becoming a partner of the firm. Nothing anywhere in the documents to support what is, correctly noted by Judge Montali, mere conjecture. I would sort of sum that argument up with what I think – let me just look at my notes here to make sure I addressed Your Honor's question. I think I did. And the statutory limitations problem, again, Your Honor, is obvious. You're talking about an appendix from 2002. You're talking about disbursements made in 2006 through 2008. You're talking about releases from a 2010 document. All of that, I think, troubled Judge Montali at where we are. And I think it's very apt. Most of the conduct, the biggest dollars is 2023, right? 2021, Your Honor, on SpaceX.  And, again, what does the complaint say? I think we've gone through that. And Judge Montali sums it up. This is page 5 of his opinion on the First Amendment complaint. Because the trustee brought, you know, I think seven claims in the first complaint. And Judge Montali expected something much more narrow, maybe brucia fiduciary duty, if you can prove it. And it became eight claims. And he said, I have three minutes left, a couple other points to hit on to the panel. First, there's an argument in the brief. Well, as to unjust enrichment and declaratory judgment, that was waived because it wasn't in the motion to dismiss. Well, the reason it's not in there is simple. We have a page limit. And when you're dealing with a complaint the size of the old Yellow Pages phone book with thousands of pages of exhibits, you have to pick and choose and be judicious as a lawyer as to the arguments you can address. Judge Montali actually admonished us about excessive footnotes to squeak into that. And the law is clear that a reply brief can also raise issues because we were responding to theirs. So I would urge the Court to disregard that point as well. On the turnover claims, again, I think Judge Montali got it right. I'm aware of the Northern District opinion that counsel cited. I don't think it applies at all here to the facts of this case. This is turnover in the context of a breach of contract. It's not an independent claim in and of itself under 542. And I think that Judge Montali dealt with that properly. And the last point on discovery here, again, I just emphasize for the Court the extensive Rule 2004 opportunities that the trustee, that the planning minister had here and used. And there's an argument in the briefs that, well, this is like Judge Montali said it was a discovery dispute. Well, it was not a discovery dispute, and he didn't say that. He observed that it was like a discovery dispute because they're asking for more. I think this Court actually got it right, and I'll end with a quote that this Court had in denying the interlocutory appeal. It was, quote, the bankruptcy court's comments regarding discovery were not the basis for dismissal of the appellant's claims. That's correct. The basis for the dismissal was the failure to plausibly plead any claims. Thank you. Thank you. Thank you. Whoever, go ahead. Thank you, Your Honor. I'd like to start with the releases issue that you mentioned, Judge Ferris. So my colleague on the other side mentioned that Judge Montali preserved the 2021 forward. There's no discussion in Judge Montali's opinion as to why there is a date of 2021. If the releases were signed in 2010, which is when the settlement agreements took place, what happens with that gap between 2010 and 2021? Does it matter? Does anything you know have happened during that period that's actionable? It appears that there were distributions in the 2006 through 2008 funds. I don't know what they are, but it may be impactful. In addition, the releases that were enforced by Judge Montali in the settlement agreements, it bears note that the settlement agreements were by defendants in their individual capacities as to avoidance action claims regarding prepetition compensation. And there were de minimis settlement values. It wasn't anything in relation to their status as managers of the funds, as fiduciaries of the funds. If the Court will forgive a monopoly reference, the appellees in the bankruptcy court have assumed that this is a get-out-of-jail-free card, where appellees don't have any requirement as managers going forward to do anything, that at least between 2010 and 2021, they could do whatever they want because they signed a release that doesn't mention any of the funds at all. And according to settled Ninth Circuit case law, the settlement agreements in each of the terms, each of the recitals have to be looked at together, with each being used to help interpret the other. If you look at the Court's opinion that discusses the releases, it talks about how the Court was very familiar with the releases in the settlement agreement that the Court had presided over the case for a long time, and used that to say, well, the releases are all encum — or in the written opinion that talks about an actual analysis of each of the clauses, including the recitals, which specifically refer to 2007 through 2008 compensation and avoidance action claims, and repaying a certain portion of that, rather than anything regarding what we're talking here today. And then I'd also like to just go back to the plausibility argument that my colleague discussed, because his plausibility argument relies squarely on the 2002 appendix being enforceable for the purposes of a motion to dismiss. Robertson was there anything — there was discovery, whether it was 2004 or whatever else — was there anything in that discovery that was inconsistent with that unsigned document? So the document itself omits a schedule that's attached that lists the members' amounts of membership interest. The appellees pulled that from a different document in a different location and attached it, and then used signature pages from a different document. Okay. But what about the people that you were asking these questions of? Did they say that their memory was different, or that something else was different or inconsistent, or that there was some common stock that the VLG or Heller-Ehrman could be held to?  So we only got — to answer Your Honor's question, for the 2004 actual depositions or examinations that took place, we took the examination of Mark Royer for two or three days. And I don't recall what he specifically said to that regarding that. He said that his understanding, I think, was that the third amended agreement was in place. But I don't recall his exact response. We were going to take the examinations of the individual appellees that are currently managers, but we were waiting on them providing the unredacted versions of Excel spreadsheets and locked documents, which they never provided. And upon reviewing the information that had been accessible, we determined there was enough to pursue a claim. And I think, as Judge Coffman said in one of the cases that were cited in the brief, if there's enough to go forward, if there are colorable claims, then you go forward and you don't continue to pursue 2004 discovery at that point based on public policy. Okay. You're past your time, so I'll thank you very much.  No, quite all right. Quite all right. Thank you very much. Thanks, both of you, for your good arguments. The matter is submitted. Thank you, Your Honors. Thank you.
judges: FARIS, BRAND, and CORBIT